Good morning, your honors. My name is John McKendry. I represent the plaintiff for Appellant Sharon Patches. With me is Loretta Jacobs Schwartz. This is an employment discrimination action alleging disparate treatment of a female police officer who is also a homosexual as developed in the Professional Standards Board investigation. In which she produced evidence that the police officers and officials of the Department of Professional Standards Bureau failed to treat her and other women as favorably as they did similarly situated male employees concerning investigations and the disciplinary process. It didn't sound to me like the examples of similarly situated male employees were all that similar. It actually sounded to me looking at the record that she got treated about the same as people who committed similar offenses and lighter than people who committed other offenses and heavier than people who committed less serious offenses. I mean, it seemed pretty reasonable. Who do you think, if you had to point to somebody whose conduct, another officer who was disciplined, whose conduct was in your case, in your view, similar or worse, who got disciplined less severely, who would you point to? What's the case? Well, I would report or would refer to the sexual harassment associated with Mullen and I apologize if I don't pronounce it correctly. Karasek? Karasek, thank you. I didn't see that Mullen was Karasek's supervisor. Did I miss something? Pardon me? I didn't see that Mullen was Karasek's supervisor. Well, I guess the issue is whether or not that is a relevant criteria on the issue of what is or is not similarly situated situations. Here, the problem is Why wouldn't the fact that there is a supervisor-supervisee relationship and then apparently your client then used that relationship to promote the person she was having a relationship with, why isn't that something that an employer can view as highly relevant? At the time that the discipline, what we're talking about, was issued, she was no longer her direct supervisor. I believe the evidence. It was based on conduct that occurred while she was a supervisor. A part of the conduct did, I would agree. Three disciplinary incidents occurred. Right. I would agree that some of the incidents, I don't recall the precise number, occurred while she was an indirect supervisory situation. But the issue that Patches tried to bring was the process. The process in evaluating prior incidents of conduct depended to a great extent on whether or not the issue was one of sexual harassment that had relevant considerations associated with it under the Eighth Circuit case upon which she has relied for the argument purposes here, rather than the Sixth Circuit case, which the trial court relied on. Since, if you look at all of the conduct dealing with issues of sexual harassment or, more importantly, issues of gender-based discrimination, particularly with statements of which there were statements against Patches of inappropriate touching and other such things, the conduct was always principally determined to be in violation of professional standards. There was no determination as a part of the procedure that was being followed by the Department of addressing the issues involved as to questions of sexual discrimination or sexual harassment. In determining whether or not either the Eighth or the Sixth Circuit standards should apply, in applying the issue of looking for disparate treatment, one of the relevant issues plainly has to be whether or not there is a history of sexual harassment or sexual discrimination being committed by individuals in the department for which the department has pretty much a policy or practice. or procedure of covering up. That is important because her claims, that is, Patches' claims, don't deal with the discipline that was imposed. And the relevant criteria isn't, was X number of days or hours discipline imposed here as opposed to some other kind, but whether or not the process, both the way the investigation was conducted, the procedures that were utilized in determining what would, in fact, be the issues to be investigated. You say a lot of abstractions, but I'm not catching what really the beef is. The guy who said the offensive things to your client got 200 hours of suspension. I mean, it just, from just looking at the cases, it looked to me like they handled these cases pretty reasonably and pretty consistent with what one would expect to be a responsible, reasonable response to misconduct in the workplace. What are the cases you say were not investigated? Well, I mean, they're all cited in the brief, Judge, and I can... Well, give me your best example. It's very clear that the district court felt that you didn't have comparable situations or persons to compare with Patches' discipline. Right. And the district court, the way I read its decision, in any event, was arguing that Patches' subjective attitude about what some of the other people, upon who she realized was doing, was violating of the rights rather than the record. And the issue that I think is important and would like to take a moment to argue is that that was a strong position for Patches to take, because there is no systematic way of building a record of identifying what the relevant criteria are, either under the Sixth or the Eighth Circuit decision, for comparison. If the comparison analysis deals with the individual officers who, for example, were engaged in domestic violence, what does that have to do vis-a-vis domestic violence with their spouse or significant other with issues of Patches trying for personal reasons to check the computer on her significant other's conduct? How can those two be relevant? And the issue, I think, and the ones she articulated below and is attempting to articulate this morning, is did the conduct reasonably relate to allegations of sexual, gender-based discrimination or sexual harassment under Phoenix policy? And under Phoenix policy, those matters were reduced to obscurity by principally being determined to be conduct unbecoming. All of those cases that she cites deals with gender-based discrimination. The conduct unbecoming is not really sweeping under the rug. Didn't the guy who said offensive things to her get discipline for conduct unbecoming? Pardon me? Didn't the guy, the officer who said the harassing, the unpleasant offensive things? Oh, Sergeant Bassett, early on. Yes. Didn't he get discipline for conduct unbecoming? And didn't he get 200 hours? That's correct. For the first offense. This is hardly sweeping things under the rug, saying it's conduct unbecoming. But the comparison issue for Sergeant Bassett, as we pointed out in our brief, doesn't deal with the first incident. It deals with comparison with the second incident. She doesn't want to include the first incident, but I don't see how she can exclude it. Well, it's part of the evidence, of course, that she produced. It's part of the evidence that the city produced. But it isn't a background evidence of sexual harassment or gender-based discrimination in accordance with the policies of the police department or the city for maintaining records of such conduct. And the reason we respectfully submit that that's not true. Here's my problem. Your client did something that was pretty bad. It wasn't horrible. It wasn't the end of the world. But it was pretty bad. She had an affair with a subordinate, and then she was found to have used her position as a supervisor to try to get a promotion or try to get a job, a position for her person that she's having an affair with. Now, I don't care whether this is the police department of Phoenix or any place else. You do that anywhere, that's considered to be misconduct. I can't imagine any company or organization that wouldn't consider it to be something that's sanctionable. Now, wait, just let me finish. Sure. So she's got this. It struck me that she got what was not at all an unreasonable discipline. 40 hours of suspension strikes me as not being wrong. And she now wants to build this case that the city of Phoenix ought to be doing something else completely, ought to be examining people's domestic situation, and that she wants to restructure the way the city of Phoenix police department deals with its officers for the purpose of showing what? Showing that she somehow deserved less discipline, that the misconduct that she clearly was guilty of, somehow she should have been treated more lightly. I sort of don't understand where you're going with this, or where you could possibly go with this. Was she supposed to get a medal, a promotion for having done this? Of course not. So what is it that she would have expected to happen when she got caught doing what she clearly ought not to have been doing? That she be treated similarly to the way the males are treated in the various examples she cited? The way she thinks the city ought to treat other people that do things that are wholly different, like engaging in domestic violence that has nothing to do, I mean, it's not a good thing, certainly, but things that have nothing to do with other employees, have nothing to do with things on the job. You look at all the incidents, all the things that your client cites that involve misconduct involving another employee, and I can't find a single one that I thought, gee, this was much worse than patches and got treated more lightly, or the other way around, it was much easier. They seem to fall in a pretty consistent, reasonable pattern. And I would like to come up with one case, one case that is actually where people got disciplined, that you think shows that the conduct there was much worse than hers, and yet got treated more lightly. Give me one incident. Well, I can give you several that she has argued. You've got to persuade me. I mean, you know, the fact that she thinks this is worse doesn't, you know, give me an incident, and then you say, look, here's why this is worse, and this shows that the city of Phoenix is being unreasonable, or it's misapplying. You have the example, Your Honor, of the individual who was impermissibly touching one of the females and asking one of the females to engage in sex. Pardon me? You have a name? I'm not right off the top of my head, but I'll look for it. It's hard to talk about these things unless you. You have the example of the male officer who was suggesting to one of the females who was pregnant that they engage in intercourse so that she would speed along the delivery of her child. You have incidents. Was it a subordinate? I don't recall if it was a subordinate. What happened in that case? The investigation did not result in discipline of the same nature or the seriousness. What did it result in? I don't recall without checking my notes off the top of my head. It was an investigation, and it resulted in something. Yes. But it was in all of these examples, the results was and the determination was less serious than that which was accorded to Patches for conduct, which, quite frankly, is conduct more serious than what she engaged in. For example. You want a sentencing guidelines kind of approach to this thing, but with no upward departures or no downward departures or no nothing. Kind of like a matrix. If you fall within this box, you get 60 days. We don't care about the details. No. On the contrary. This isn't like workers' compensation where a broken arm equals X dollars. That's what it sounds like you're asking for, and it seems to me that the board here exercises discretion. Every case varies a little bit from everybody else's. Every case is going to vary by nature of the human. Isn't that within the discretionary power of that board to determine? Now, we want to get in there and start rethinking all the discretionary applications of its power? No, you won't. But Patches sincerely argues that you want to look at all of the relevant criteria, not whether or not the conduct was identical or that the status was identical or identity of the other kinds set forth in the Eighth Circuit. The problem is when I ask you for facts, when I ask you how these things, you know, you don't know what discipline was involved in those cases. You don't know whether they were subordinate. And so all the ways in which these things, you know, you want to show some sort of inconsistency, it raises a decision by the board. But you can't give me any facts that allows me to compare the two incidents and where I can agree or disagree whether or not this was a reasonable decision. You just say, oh, well, it was different. The conduct was worse. There is. It doesn't really help any. No. I can give you. Is it in your brief? I mean, you got your brief there? Yes. Well, okay. Tell me where the incident, you were discussing an incident involving somebody who offered to have sex with another employee in order to speed up delivery. Where is this discussed? Let's talk about it. You know, that's the case you've raised. Let's look at it. Sergeant Russ Wilson and Officer Mary Roberts discussed at page 18. Okay. Sergeant Tom Mullins. Let's talk about that one. What happened with Russ Wilson and Mary Roberts? There you had complaints about supervisor subordinate affairs. You had Sue Porter, a sergeant in the sex crimes unit, raising concerns about the effect of an alleged romantic relationship between Sergeant Wilson and his direct subordinate, Officer Mary Roberts, almost identical in certain respects. They both denied it. They denied it. Which they denied. Was there an investigation? No. That's the issue. Had there been an investigation, the denials may or may not have been credible. Here you've got a situation where there was evidence in face of their denial. Here there's no doubt in your client's case that she was having an affair with a subordinate. She readily admitted it the first day of the investigation. Okay. She didn't lie. She didn't hide it. Here you've got another incident where the two participants vigorously denied it. This is the way it was described, they vigorously denied it. They have to make a decision as to whether or not to pursue it. I don't understand how you think these things are comparable. Well, because the difference here of treatment was when it wasn't known whether or not Patches was going to deny it, an investigation started where, in the case of these two persons, there was no investigation and a simple denial, but there is still evidence that there was an affair and their relationship had an impact on the workplace. That gentleman was treated differently than Patches is her point. All allegations must be investigated. That's the rule. If they're not, you're in court. If they deal with issues of sexual harassment and gender-based discrimination, of course. No matter what the allegation is, it shall be investigated. Sure. And a failure to do that. That's your position. That's our position. Sure, of course it is. Otherwise. This is harassment because both of the participants said it didn't happen. So it's not like one of the participants says, oh, he harassed me, and the other guy denies it. Here you have both parties, both people involved, saying, no, it's just not true. And what you say and you believe is there were rumors. Rumors? It was even rumored that Wilson left his wife for his subordinate employee. And there was evidence that this incident or conduct adversely impacted on the work crew. Oh, that's right. Enough evidence said another way to warrant an investigation. But that's one of many examples. The other, of course, is Sergeant Tom Morris and Detective Karasak that I've already mentioned. It's on page 19 to 20. Major Gertenbach and Jan Meredith, which is referred to on pages 20 through 21. I note my time is up. I can go on. Okay. We'll hear from the City of Phoenix or the City of Phoenix Police Department. Thank you. May it please the Court. Good morning. I am Janice Moore here on behalf of the City of Phoenix and the other defendants. Certainly our position is, Your Honors, that while the review here is de novo, the district court went through a careful analysis and ultimately said in this particular case that summary judgment was appropriate. We believe that in unique cases where the evidence is so one-sided, that summary judgment still is a measure, is a remedy that should be used in employment cases in the appropriate circumstances like this one, where there is neither direct evidence of gender discrimination, and certainly assuming you buy, the district courts rely upon the comparability of the seriousness of the conduct alleged, or if you go to the Eighth Circuit, McGinnis, or the Sixth Circuit, mispatches loses. The idea in this case, this is one of those unique cases where there was no homophobic environment, there were no slurs, there were no epithets. What really was present here is a situation where, if anything, the department was never concerned about Lieutenant Patch's lifestyle until a complaint got raised at the highest level, which was in the disciplinary review board hearing concerning Bassett. Opposing counsel says that, well, let me show you, Your Honor, there is this case with respect to Ms. Porter and Officer Wilson, and Ms. Porter suggested that there was this relationship as between these two individuals, it was never investigated. Lieutenant Yoner did, in fact, investigate it, as the record indicated, and it came up with no evidence, and both people said no. Patch's was not treated any differently. The record reflects that Commander Thomas, when first faced with allegations from Bassett, that there was rumors that they were spending too much time together, that there were rumors that, well, that she had extended preferential treatment, Commander Thomas himself said that he talked to Patch's, Patch's denied it, and it stopped. It was the same treatment. It never got to the DRB like this one did. And in an organization like the Phoenix Police Department, there surely are going to be instances where management does not know. In this case, Ms. Patch's received the same kind of treatment. They weren't out together. They didn't rush to judgment. Commander Thomas said your explanation seems fine. I'm not going to conduct an investigation. It was his failure not to conduct an investigation that gave rise to an ultimate investigation as to whether or not his conduct was appropriate. May I mention this whole thing about this alleged discrimination against women, because the department treats certain allegations as conduct unbecoming, rather than a finding of sexual harassment or discrimination. Sexual harassment and sexual discrimination have far more exacting standards, legal standards that have to be satisfied. A department that ultimately is going to base misconduct upon whether or not certain conduct rises to a legal standard is always going to be in the difficulty of not necessarily being able to discipline. The rubric of conduct not becoming suggests not that there was condemnation of the behavior, but suggests that the department was nevertheless going to discipline for conduct that it believed should not have occurred. She was treated no differently in this case than males, and in fact we contend, the record suggests, that she was treated more favorably in certain contexts. The key here is that nothing happened to Patch's until there was an allegation that her relationship with a subordinate affected and disrupted the department, and disrupted her department. That became a valid reason for the department to look into whether or not that relationship, in fact, was occurring, and whether or not there was disruption. There was nothing homophobic about it, there was nothing out of the ordinary about it, that placed her at a disadvantage because of either her gender or her sex. In this case, it seems to us, Your Honors, that in the absence of any direct evidence, the only thing we have in this record is Michael Bassett's unfortunate, horrible comment, one time, brief, could not have altered her terms and conditions of employment because she wasn't even there. The department nevertheless investigated and gave him very, very stringent discipline. That does not suggest a policy or a practice where we are condoning behavior that disadvantages female employees. Is that the situation where he got a 200-hour punishment? Yes, sir. Yes, Your Honor, for using, among other things, using the horrible description with respect to Ms. Patch's sexual orientation. So if you have nothing in terms of direct, as the district court currently, under Ninth Circuit law, said it doesn't take much at prima facie, although we argue that she didn't even get that, given the fact that the comparisons she alleged were not of apples and apples, but of apples and everything else. The district court nevertheless, based upon the notion that in these kinds of cases, intent is elusive, and prima facie case requires very little. So we're going to force the city to ultimately articulate nondiscriminatory reasons, which we did. Thank you so much. Thank you.
judges: B.fletcher, Kozinski, Trott